United States v. Djibo Good morning, may I please the court, my name is Zachary Margolisonema along with Adam Aleiwa. I represent the appellant Adam Djibo in this case. There's three issues in our briefs, each of which is complex, so I welcome your guidance on where to pay attention. The first is, was Mr. Djibo afforded a fair trial? That would dispense of the other two issues if it were resolved in our favor. The second is whether the sentencing proceeding was done properly and the sentence of 293 months for a first-time nonviolent drug offender was both procedurally and substantially reasonable. And the third issue is whether the forfeiture order forfeiting the defendant's home and $1.9 million was properly entered. That may not be your most important point, but at some point I hope you get to it because I think it's perhaps the most difficult for me to wade through. I'm delighted to start with it, Your Honor. The residents of that home are here in court today, and it is very important to them and to Mr. Djibo. The rule after Honeycutt, which we sent in our 28J letter and in our reply brief, is that the forfeiture goes to property under this particular provision that is obtained by the defendant. So we had approximately a three-week trial. The allegation of forfeiture was included in the indictment and said in the indictment that it would be based on an amount to be proved at trial, and the government failed to prove that Mr. Djibo received even a penny of drug proceeds. For that reason, because of the ample record before you, I don't think there's any reason to remand it. There's simply no evidence that any money was received by Mr. Djibo that was presented at the trial, and they had the opportunity to present it. They failed to do so. But did they know that they had to do that at that point in time? Well, I think if they had read the statute, they would have, Your Honor. Now, there was a case in Ohio. Well, lots of people have read that statute, and it took Justice Sotomayor and everybody but Justice Gorsuch to tell us what the statute meant after years of practice. So — I recall vividly at the oral argument on this in front of Judge Johnson, you know, they brought in their special clerk, and I don't know if she's here today, but their special prosecutor who specializes in these cases, and I said, look, you grab the drugs. You can keep the drugs, which is really the rule. It's the property obtained, which was the drugs, which was maybe money obtained by Stanley Walden. I mean, that's the essence of forfeiture. We all learned it in law school. And the case law went so far beyond that. And then they told me, well, that's ridiculous. And then Honeycutt came down. So I think that they were on notice, and I don't think they should be allowed to reopen the trial record. And frankly, I don't — I doubt even if they did that they would find any evidence of that. Again, there's lots of things in this case to forfeit. There's just no money that ever went to Adamujibo that they have any evidence for. Okay. So — Can I ask about the first issue, the Walden phone records? Yes. We've had a lot of time now to have a Swahili translation of them to show us that there's something there which would have helped your client, whether on cross examination or exculpatory. I still don't see it. Why not? Well, because I wasn't given enough Swahili language translation assistance. I asked for it after the trial and was denied by the district court. Yeah. Rule 33 motion. Yeah. What about here? Is there a procedure for doing that? Not that I'm aware of. How do you meet your burden to show there's something there? Well, I think my burden is to show that the trial was not a fair trial. So the — I mean, I think there's enough there to show that the combination of the late disclosure and the denial of CJA resources undermines confidence in the trial. And there — and, you know, I've given snippets — There would be an objection to the late disclosure right around the time of the start of the trial, when they set out — when the district court said, I'll give you another day then to go through these records some more. There doesn't seem to be another objection to that. Well, so the rule on that, Your Honor — and that's — there wasn't a subsequent objection. I asked for a delay. It turned out, in hindsight, the delay of a day wasn't enough. I'll concede that that's sort of a hindsight analysis. But the rule on that, that I would urge this Court to adopt — and I'll have to find the name of the case, but there's a D.C. Circuit case that makes it clear — is that in situations of late disclosure of Brady, there's no burden for the defendant to ask for an adjournment. And the reason for that is because if that — if the rule were the defendant had to ask for it, it would really give a tactical advantage to the government and encourage this kind of bad behavior. How do we know that there's Brady there? You've got the — you've got the redacted materials, which are substantial, with translations. How do we know there's Brady? Well, I would submit that there was materially exculpatory evidence that we — that did emerge from that. There are conversations with another person in Swahili about drug trafficking. About marijuana trafficking. Well, no, there's conversations about marijuana use, and there's conversations with a woman named Lily Luka Milwa. And we had phone numbers for her and identifiers, but we were denied — Those conversations implicate heroin trafficking, don't they? They — well, we don't know what drug it is, but we know — yeah. I mean, I would suspect they do. They talk about the specific border crossings on the specific trip that he was on — that the cooperator was on when he was caught. But the key here is I asked for a private eye so that we could call those numbers and find out who she was and find out more about it. And time after time after time, I was denied that by the district court. And at some point, there has to be a remedy. I can't answer all your questions about it because I'm not allowed to have an investigator. All right. Let me go back to one other point on this in this same vein. It — you got what you got from the government after you filed a motion. But as I understand the record, you made a request for this information. How much — Another eight months in advance, yeah. Why so long to file it? Well, first of all, my — the district I practiced in as an assistant U.S. attorney and as defense counsel, there was pretty much at least quasi-open disclosure. What is the practice in the Eastern District? Quasi-open disclosure, Your Honor. The practice is — and I want to sing the praises of the Eastern District while criticizing this particular prosecutor. I've been on the CJA panel for 12 years. I've never had occasion before to accuse a prosecutor of misconduct. I mean, they don't do that. So we trust them. And I didn't know this particular prosecutor, but I trusted if this prosecutor says there's no Brady, there's not going to be conversations about crossing borders on the very same trip. So, yes, the other — What was the objection by the government, as you understood it, to essentially disclosure of everything out of that cell phone? They said there were safety concerns. And there's no hint of violence anywhere in this case. I mean, it's a drug case, but there's no — They said there were safety concerns. And that was enough for the district judge. Because, again, we trust the prosecutors in the Eastern District. And part of the reason we trust them is because we have these rules that they're supposed to follow. And they take an oath to follow. And in this case, Ms. Karen Canuzzi violated the rule, and she violated it to get tactical advantage. I mean, she violated it so that she could sandbag me the Friday night before trial. I was there at 5 p.m. The records weren't there. I sent a paralegal two hours later. They gave us a drive that didn't work. Saturday morning, we're calling, screaming and yelling to the prosecutor's office, make this drive work. Finally, Saturday night, we realize that half of it's in Swahili. Sunday morning, I'm calling around to my friends and family to find someone who speaks Swahili. What the heck is this? You know, by Tuesday morning, because Monday we head off, we're at trial, and our back's against the wall. We had a whole strategy that, if I had time to consider the new evidence, would have been completely rethought. Roberts. Thank you. Roberts. You've reserved three minutes for rebuttal. Roberts. Yes. Roberts. Mr. Kessler. Kessler. Thank you. May it please the Court, David Kessler, along with David James and Claire Kadeshian for the United States. I'm happy to start in any order. Kessler. My same request to you is I don't care what order it is, but I hope at some way you get to forfeiture. Kessler. Sure. So with respect to forfeiture, I think there are a couple of different issues, and some may be more complicated or newer than others. We agree that the forfeiture judgment, as it stands, should be vacated after Honeycutt, which now explains to us that the statute means something different than what everyone thought it meant. I think the question here is what should happen after the vacature, and our position is that the case, the forfeiture judgment, at least, should go back to the district court for the parties to argue under Honeycutt whether the government has met its burden of proving, you know, forfeitable assets of a certain amount. There's evidence in the record of drug proceeds that go beyond the drugs that were seized at each of the three couriers' final trips. So it's not the case that because, you know, Cooperator 1's drugs were seized, you know, there's no evidence of any other drugs. You know, the government already has those drugs because they were evidence of prior trips. So there are potentially forfeitable drug monies out there. So that's the second point. The third point on the house, the house is sort of tangential. The house comes in as a substitute asset. So first we just ---- Kennedy, you say tangential, but it's terribly important in this case. No. I don't disagree it's not an important consideration, but it is tangential to Honeycutt, the Honeycutt consideration, because first the district court would have to decide are there ---- is there forfeitable money or forfeitable ---- And then it has to be traced to the house. Right. It has to be traced. Now, in this case, the defendant, you know, there appear to be assets overseas. We don't have a complete financial ---- So you don't know at this point whether the house would or would not be traceable as would go on in the district court if it went back? That's right. Also, the house is a substitute asset. So it's not actually even required that the proceeds necessarily be traced. It can ---- we could ---- No, no. I understand that. But that's the problem here is that we are concerned not about money in the defendant's hands. We're concerned about his family and what happens to them afterwards, not as a legal matter, just as a human matter. And I don't dispute that's a legitimate consideration that, you know, a court can think about. But the sort of doctrinal framework is, first of all, should there be money? Second of all, if we can't find it, can we see something else? Gotcha. So that's the issue that's before the court. With respect to the, I guess, the Brady question, these phone messages, you know, I think ultimately the record is this. A large amount of the vast majority of the phone records are not in Swahili. So there's been six months or eight months or a very long time to review everything that isn't in Swahili. If there was anything new, it would have been brought to the court's attention. So we can set those aside. The record is not clear about how many Swahili pages have not been reviewed at all. It's nowhere in the record. There's one letter to Judge Johnson that suggests there are hundreds of pages that haven't been reviewed. But hundreds of pages of a Selbright report, which is what's being talked about, there's actually very little content because there's lots of headers and things like that. So the record's not clear on what hasn't been reviewed. And the record is also, it's not even clear that Judge Johnson denied the request for a translator after the trial. The defendant sort of submitted this letter saying, I know you granted me a translator during the trial. I'd like to keep using her. And then there's silence. And that request, first of all, that request was made ex parte, so the government was unaware of it. And it wasn't renewed. So there's a Rule 33 brief that doesn't mention no translator. There's a Rule 33 reply brief that doesn't mention no translator. There's no request for an adjournment of the Rule 33 argument. There's no request for an adjournment of the sentencing. Then we show up at sentencing and there's a passing mention to a pending request for a translator, but nothing more. So that's sort of the record with respect to what might be untranslated or unreviewed. I think it's far from clear that even the defendant believed from conduct that there would be important new evidence. And that's because a lot of what was in Swahili was reviewed. It's certainly not exculpatory in the sense of pending to show that the defendant did not commit the crime. It's arguably jigglio material to impeach the cooperating witness, but the cooperating witness was cross-examined based on it extensively. The defendant spent, I think it's 12 pages of summation transcript, you know, attacking the cooperator's credibility. That credibility was corroborated. The timeline's a little unfair to the defendant at the time of the trial. You get one day of continuance to try to figure out how to translate Swahili and you don't have a Swahili interpreter. I mean, that doesn't sound right, does it? I'm not arguing that that was the best practice or that it is standard practice in the Eastern District for the disclosure to happen in that manner. It's not the government's position. The position is really here we are today, you know, what should happen. Why not order a translation now and renew the Rule 33 motion before the district court? I mean, that is, I would say, our alternative argument, and I think that is as far as this Court should even think about going with respect to the conviction, setting the sentencing aside. We could think about going much further, whether you want us to or not. No, I'm just urging you not to. All right. You can think however. You concede that it was procedurally unreasonable, the way the district court sentenced this individual, where at the time of the original sentencing he adopts the PSR, which has 100 kilograms of heroin, but then gives the top of the guideline range to a number, the 6 kilograms the government was willing to concede should be considered, files a strange statement of reasons, which is unclear whether it's a non-guideline sentence or is it a top-of-the-guideline sentence, and then five months later, after the appeal is filed, files a new J&C with a new statement of reasons? I've never seen that. I don't concede, and I will explain in a second, but I just want to add one more thing to your prior question about unfairness, which is part of the unfairness about the timing of disclosure, I think, needs to be viewed in terms of the ultimate result, which is limited or no impeachment material that was actually found in the Swahili messages. We don't know that because they haven't been translated. Well, no, a lot of them were, and so I agree, but in what there was, there is very limited. The corroborator was certainly corrupt. There's some. Let's say for purposes of argument it's Jiglio, or it could be considered Jiglio. Sorry. There is some, but the question here is really would anything more have been cumulative? The corroborator was cross-examined. He admitted he lied in a number of different ways. His credibility was attacked at sentencing. He was also at summation. He was corroborated in a number of ways. So the question is really, hypothetically, if there's something out there in the Swahili that's untranslated, would it just be cumulative? And I took you away from answering Judge Domeni's question, which you were going to. So I think the literal procedure of the second judgment or the second statement of reasons coming later is odd, or it's certainly uncommon. But I think the record at sentencing is clear, that the district court adopts the findings in the PSR as they stand. It's kind of odd that he picks a number for the sentence, which is the top of the guideline range, for the 6 kilograms, though. Why would he pick that number unless he used as a reference point the lower quantity? Well, I think he could do both, right? Because he couldn't explain it. Well, I mean, the statement of reasons explains that the below-guideline sentence is because of family circumstances. But I think, right. The May, 5 months later. That's right. But a district court, you know, often this happens. A district court will, you know, sort of calculate the technically correct guidelines range based on the facts and then, you know, depart from that, you know, for whatever reason. And I think here the district court. Did he say it was a departure at the initial sentencing? Well, he said he found the facts in the PSR, and we actually went back and forth about, you know, a little bit of the objections in the government's, you know, the defense counsel brought up the government's letter, which talked about the 6.5 kilogram number. But he didn't say it was a below-guideline sentence or a. . . I don't recall him using the words this is a downward departure. But, you know, I think the court can be guided by the guidelines, but also by other considerations. And I think what happened here is the district court didn't disagree with the facts in the PSR, but then believed under the 3553A analysis, a lower sentence was appropriate. You know, the initial statement of reasons. . . But how did they arrive at the 100 kilograms in the PSR? It was in part based on the two other defendants who were stricken from the case. Well, the evidence of them was not argued to the jury. Right? The court found during the. . . The court found you can't argue that. Well, the court found that the government had not connected the evidence as of, you know, whatever, the middle of or toward the end of the trial. At sentencing, the district court also had the benefit of our Rule 33 briefing, which lays out all the connections which were not presented to the district court during the trial. So I don't think that's inconsistent because I think more information was shown to the district court about the links between those couriers. At the time of sentence. By the time he was sentenced. By the time of sentencing. We laid that out. And that's in the government appendix. We have the excerpt of the Rule 33 brief. I apologize. I don't have the page number off the top of my head. But essentially, you know, there's been no showing of prejudice based on this record given how cumulative any additional Swahili impeachment material would have been in this trial. And certainly to the extent the court disagrees with that, the proper remedy with respect to the current standing of the case would be to look at the Rule 33 motion with additional translation time, which I guess the defendant is now requesting. Well, that's just about me. Access to a translator. But the court doesn't have to reach that for purposes of the Brady argument here because the record is clear that at a minimum there's no prejudice and there's no reason to believe the outcome of the trial, which is really the standard here, would have been different on that point. Thank you. Thank you, Mr. Kessler. I want to try to talk fast or not too fast. Maybe you'll get time to answer another question. And that is, from listening to your adversary, if this goes back to resentencing and it was resentencing was under the correct guidelines, wouldn't that put your client at risk of getting a higher sentence? Certainly at risk. I think it would, if we were given an opportunity to litigate that, we'd be able to show with the benefit of the full Swahili translations, assuming the conviction stood, that Mr. Jebo's role in the offense was something much smaller and his responsibility was much lower. But it is a danger, although you think it's worth the risk. Yeah. I mean, I would say we're also requesting that the case be reassigned to a different judge. Go ahead. Yeah. So let me start with sentencing, which I didn't really address. Can I ask you about that? I hope you'll give me additional time that he needs. But what is — how do we decide whether to assign to a different — I mean, what's the basis of your wanting it assigned to a different judge? The appearance of unfairness, Your Honor, is the standard, and it's actually not that high a standard. And it's routinely done in the Eastern District when cases are remanded at the district court level. I'm not sure if the rule is — I think that there is a district court rule on that. It's — in this case, I think the judge demonstrated by his comments on the record that he misappreciated — that he didn't understand the role of the guidelines. He — when I told him that this was, you know, that there were significant mitigation here, he said, well, isn't that an argument that should go to Congress, because Congress essentially sets forth the guidelines. I mean, that is ignoring the now, what, 12, 13 years since Booker, that that is not the approach, that he did have much broader discretion, which he seemed to not understand. The — you know, the sort of eccentricity of the back-and-forth PSR — I'm sorry, statements of reasons, including one after I had filed my brief, also indicates that he doesn't want to listen to me. He's done. The sentence is 293 months. And for those reasons, I think it should go to a different judge. One final point on that is, when he said, I adopt the PSR, the problem is that the PSR didn't adopt a view of the facts. It recited the government's view of the facts. It acknowledged that we had a different view of the facts, and it said, well, we'll leave the resolution of these facts to the district court. I didn't ask for a Fatico hearing because there was an ample trial record. But essentially, the judge had an obligation to resolve those factual disputes, not just say, well, I adopt the PSR because the PSR didn't give a view. So that's sentencing. If you asked him to resolve the facts in our favor, yes. I laid out the basis based on the trial record in our briefing, and as much as he would let me at sentencing. If I may address the other two issues very briefly. You're going to have time, yes. Thank you. The PSR does adopt a base offense level based on 100 kilograms of heroin, right? Well, the PSR asserts that, but then it says the resolution of factual issues is to be left to the district court. The veracity, I think, is the term they used. But not about that. I mean, it doesn't specifically say that as to the amount, right? I mean, I think if you look at the addendum, I don't have it memorized, but you'll see that it acknowledges that that's one of the things that I'm objecting to. And also, that was something where the government itself said it would be reasonable to use the 6.7 instead of the 100 kilos, which, you know, I was hanging my hat on. It didn't do very well with the judge. I'll move on to the other two issues very briefly. So the — in terms of — I just want to challenge something that the government said, that there's evidence in the trial record of proceeds of this conspiracy beyond the drugs being seized. I don't know what they're talking about. Maybe hotel rooms were rented. I mean, there's no bank record. This is not a case with any financial evidence was submitted that I'm aware of at all. And I don't think they'll find that there. And I think that record is before you, and this Court can decide that without a remand in any event. And I notice they didn't specify what they meant by that. That's what I have to say on forfeiture. I do want to make one point about the Swahili and the Rule 33 point. I apologize. I should have done an analysis as to how much Swahili was left untranslated after trial and how much was translated. The point there, though, is that anything exculpatory is going to be in Swahili because Mr. Jebo doesn't speak Swahili, and the cooperator, the drug smuggler and his other cronies who are working with him do. So almost anything in Swahili is likely to be valuable to us. Thank you. What about the argument that you never renewed that request during the Rule 33 proceedings? Well, I did. The letter, I don't remember the date of it, but the letter is in the appendix. And I mean, again, and this is part of the reason I wanted to defer to Judge, not responding to CJA requests has the effect, you know, when the clock is ticking and your client is in prison, has the effect of denying them. And it was effectively denied. I will say also, Judge, this is a 2015 trial. We had a translator that we had working around the clock during the trial who was very generous with her time. She still hasn't been paid. I mean, we have had a constant struggle with the clerk's office, not with the clerk's office, with getting things approved. I mean, Swahili translators are less sufficient. They don't come to court every day the way Spanish and French translators do. But this has been a constant problem, getting these resources. And, again, I feel like, well, I'm one guy. What do you want me to do? And the fact is I think we did everything we could to renew that and now to show the prejudice that, you know, this sort of pocket veto caused. Roberts. So is that just an aside, not outside of this, but is that, whatever invoice has been submitted by the translator or invoice is still awaiting approval? At this point, the work at the trial, I think, has been approved very recently in the last couple of months. My office handles it. But it took that long for her to submit it correctly, for the judge to pay attention to it. And hundreds of hours of sort of pro bono work, because we don't bill for that, of us, not hundreds of hours, but hours and hours of my paralegal on the phone with the clerk's office, with the judge's clerks. And there's been just a sense that it's very frustrating. And I would try to find, you know, I would try to work this out. As you're probably aware, there's an effort to try to get, in the CJA community, to try to get approvals for resources to be done by someone other than the trial judge who would come in to separate those functions, which I very strongly support. Scalia. Well, we have a statute, I think, that covers that. So, well, we might even support it. Those of us on the CJA committee here, it takes some more work. But keep working at it. We all will. All right. Thank you both. Thank you both. We'll reserve decision in this matter, but a helpful argument on both sides. Sorry. And the last case for argument is Green v. St. Barnabas Hospital. And Ms. Green has 5 minutes to argue, and we understand that counsel for the hospital is here if we have questions of him or them. Right? Two of you. You're Mr. Frank, right?